# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### ASHEVILLE DIVISION
### CIVIL CASE NO. 1:20-cv-00227-MR

| | | |
|---|---|---|
| **WASCO LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | <u>ORDER</u> |
| | ) | |
| **NORTHROP GRUMMAN** | ) | |
| **CORPORATION, CNA HOLDINGS** | ) | |
| **LLC, CHEMTRONICS, INC., WNI II,** | ) | |
| **LLC, MCGREGOR II, LLC,** | ) | |
| **SAMSONITE LLC, GILDAN USA** | ) | |
| **INC., DYNA-DIGGR LLC,** | ) | |
| **BLUE RIDGE INDUSTRIAL** | ) | |
| **SUPPORT CO. & SMOKEY** | ) | |
| **SMOKEY MOUNTAIN PALLET,** | ) | |
| **INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Defendants Northrop Grumman Corporation, CNA Holdings, LLC, and Chemtronics, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint [Doc. 77], the Defendant Gildan USA, Inc.'s Motion to Dismiss the Amended Complaint [Doc. 79], and the Defendants Samsonite LLC and McGregor II LLC's Motion to Dismiss Plaintiff's Amended Complaint [Doc. 81].

## I.    PROCEDURAL BACKGROUND

On August 18, 2020, the Plaintiff WASCO LLC ("Plaintiff"), filed this civil action pursuant to the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") against Defendants Northrop Grumman Corporation ("Northrop"), CNA Holdings LLC ("CNA"), Chemtronics, Inc. ("Chemtronics"), WMI II, LLC ("WMI II"), McGregor II, LLC ("McGregor II"), Samsonite LLC ("Samsonite"), Gildan USA Inc. ("Gildan"), Dyna-Diggr LLC ("Dyna-Diggr"), Blue Ridge Industrial Support Co. ("Brisco") and Smokey Mountain Pallet, Inc. ("Smokey Mountain Pallet") (collectively, the "Defendants") for recovery of response costs incurred as a result of the release or threatened release of hazardous substances at a property known as Asheville Dyeing and Finishing facility (hereinafter "AD&F Facility"). [Doc. 1].

Specifically, in its First Claim for Relief, Plaintiff seeks the recovery of costs from the Defendants pursuant to 42 U.S.C. § 9607(a) ("CERCLA § 107(a)"). [Id. at 22-23]. In its Second Claim for Relief, Plaintiff seeks contribution from the Defendants pursuant to 42 U.S.C. § 9613(f) ("CERCLA § 113(f)"). [Id. at 23]. In its Third Claim for Relief, Plaintiff seeks equitable indemnification and/or contribution from the Defendants under state law. [Id. at 24, ¶ 13 ]. In its Fourth Claim for Relief, Plaintiff seeks a judicial declaration

that Defendant Northrop is solely and exclusively liable to Plaintiff for all future response costs associated with the Northrop Dump pursuant to 42 U.S.C. §9613(g)(2) ("CERCLA § 113(g)(2)"). [Id. at 24-25]. In its Fifth Claim for Relief, Plaintiff seeks a judicial declaration that Defendants Northrop, CNA, and Chemtronics are jointly and severally liable to Plaintiff for all future response costs originating from the Chemtronics Superfund Site and affecting surface waters or sediment in Bee Tree Creek, the Swannanoa River, or both, or any related impacts to soil and groundwater. [Id. at 25]. Finally, in its Sixth Claim for Relief, Plaintiff a judicial declaration that Dyna-Diggr, Brisco, WMI II, McGregor II, Samsonite, Gildan, and Smokey Mountain Pallet are jointly and severally liable for all future response costs not addressed by Plaintiff's Fifth and Sixth [sic] claims for relief. [Id.]. The Defendants Smokey Mountain Pallet, Brisco, and Dyna-Digger filed their Answers to the Plaintiff's Complaint, and the Defendants Northrop, CNA, Chemtronics, Gildan, McGregor II, and Samsonite filed their Motions to Dismiss the Plaintiff's Complaint. [Docs. 56, 58, 59, 62, 67].

In response, the Plaintiff filed an Amended Complaint asserting its previous six claims for relief and adding a Seventh Claim for Relief seeking an order requiring Defendants to abate a public nuisance under state law. [See Doc. 69]. On October 22, 2020, in light of the filing of the Amended

Complaint, the Court denied as moot the Defendants' pending motions to dismiss. [See Text-Order entered 10/22/2020]. Thereafter, the Defendants Smokey Mountain Pallet, Brisco, and Dyna-Digger filed their Answers to the Plaintiff's Amended Complaint. [Docs. 74, 75]. On November 16, 2020, the Plaintiff filed a Notice of Voluntary Dismissal Without Prejudice as to Defendant WMI II. [Doc. 76].

The Defendants Northrop, CNA, Chemtronics, Gildan, McGregor II, and Samsonite now seek the dismissal of this action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing that the Plaintiff's Amended Complaint fails to state claims upon which relief can be granted. [Docs. 77, 79, 81]. The Plaintiff has filed oppositions to the Defendants' motions, [Docs. 84, 85, 86], to which those Defendants have replied [Docs. 90, 91, 92].

Having been fully briefed by the parties, these issues are ripe for disposition.

## II.   STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

4

To be "plausible on its face," a plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Id.

In reviewing the Amended Complaint, the Court must accept the truthfulness of all factual allegations but is not required to assume the truth of "bare legal conclusions." Aziz v. Alcolac, Inc., 658 F.3d 388, 391 (4th Cir. 2011). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012) see also Twombly, 550 U.S. at 555 (A complaint containing mere "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do.").

Determining whether a complaint states a plausible claim for relief is "a context-specific task," Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009), which requires the Court to assess whether the factual allegations of the complaint are sufficient "to raise the right to relief above the speculative level," Twombly, 550 U.S. at 555. As the Fourth Circuit has explained:

> To satisfy this standard, a plaintiff need not forecast evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements. Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is probable, the complaint must advance the plaintiff's claim across the line from conceivable to plausible.

5

Walters, 684 F.3d at 439 (citations and internal quotation marks omitted).

## III.  FACTUAL BACKGROUND

Taking the well-pleaded factual allegations of the Amended Complaint as true, the following is a summary of the relevant facts.[1]

### A.  History of Ownership and Activities at AD&F Facility

#### (1)  Northrop

Northrop owned the AD&F Facility from October 1, 1965 (and sold it to M. Lowenstein & Sons, Inc. ("Lowenstein")) to June 14, 1971 (the "Northrop Ownership Period"). [Doc. 69 at ¶ 16]. During the Northrop Ownership Period, Northrop exercised actual control over matters related to pollution, releases of hazardous substances and environmental compliance at the AD&F Facility. [Id. at ¶ 17]. During the Northrop Ownership Period, Northrop manufactured chemical weapons and ammunition at a 1,065-acre manufacturing facility, located at 180 Old Bee Tree Road in Swannanoa, North Carolina, immediately to the north of the AD&F Facility. [Id. at ¶ 18]. The United States Environmental Protection Agency ("U.S. EPA") placed this manufacturing facility on the federal Superfund National Priorities List in

---

[1] In reciting the relevant factual allegations, the Court has disregarded all "bare legal conclusions" asserted in the Complaint, see Aziz, 658 F.3d at 391, as well as "[t]he mere recital of elements of a cause of action," see Walters, 684 F.3d at 439.

6

1983, and it is now known as the Chemtronics Superfund Site. [Id.]. Northrop has admitted its liability under Section 107 of CERCLA for wastes it generated and disposed, and the hazardous substances it released, at the Chemtronics Superfund Site. [Id. at ¶ 19 (detailing hazardous substances)]. During the Northrop Ownership Period, Northrop systematically and deliberately disposed of industrial wastes it created at the Chemtronics Superfund Site on a one-acre portion of the AD&F Facility dubbed the "Northrop Dump" by the North Carolina Department of Environmental Quality, formerly known as the North Carolina Department of Environment and Natural Resources ("NCDEQ"). [Id. at ¶ 21]. The Northrop Dump is approximately 100 feet west of a surface water known as Bee Tree Creek, which drains to the Swannanoa River, the primary source of drinking water for the City of Asheville, North Carolina. [Id. at ¶ 28].

Industrial wastes that Northrop deliberately disposed of at the Northrop Dump included wastes containing, or contaminated with, hazardous substances used to manufacture tear gas, explosives, flares, rocket propellants and drums containing finished, but rejected, rockets and flares. [Id. at ¶ 22]. Northrop also used the Northrop Dump to dispose of 55-gallon drums containing unknown types and quantities of chemical wastes and to burn industrial waste it generated at the Chemtronics Superfund Site. [Id. at

¶¶ 23, 26]. An unknown number of abandoned 55-gallon drums are visible on the surface of the land at the Northrop Dump and additional 55-gallon drums are also buried in the Northrop Dump. [Id. at ¶ 24]. Northrop's systematic disposal of the aforesaid industrial wastes in the Northrop Dump has caused releases and/or threatened releases of hazardous substances to the environment. [Id. at ¶¶ 25-27, 35; Doc. 69-1 (detailing substances)]. Releases of hazardous substances associated with Northrop's disposal of industrial wastes at the AD&F Facility have caused contamination of soil and groundwater at the AD&F Facility and may have caused contamination of surface waters and sediment in Bee Tree Creek. [Id. at ¶ 30]. Likewise, Northrop's operations at the Chemtronics Superfund Site have caused releases and/or threatened releases of hazardous substances, beyond the boundary of the Chemtronics Superfund Site, into Bee Tree Creek and the AD&F Facility. [Id. at ¶ 31].

### (2) CNA and Chemtronics

CNA and Chemtronics, "at various points in time,"[2] owned and operated the Chemtronics Superfund Site and both have admitted liability under Section 107 of CERCLA as potentially responsible parties for releases

---

[2] The Amended Complaint does not specify the time periods when CNA and Chemtronics owned and operated the Chemtronics Superfund Site. [Id. at ¶ 40].

of hazardous substances. [Id. at ¶¶ 40-41 (detailing substances)]. CNA and Chemtronics' operations at the Chemtronics Superfund Site have caused releases and/or threatened releases of hazardous substances, beyond the boundaries of the Chemtronics Superfund Site, including but not limited to Bee Tree Creek and the AD&F Facility. [Id. at ¶ 42 (detailing substances)].

### (3)    Non-Party Lowenstein

In 1971, after acquiring the AD&F Facility from Northrop, Lowenstein constructed the manufacturing structures present at the AD&F Facility today, including but not limited to the AD&F Facility's wastewater treatment system, and began using said structures to manufacture textiles. [Id. at ¶¶ 43-44].

Specifically, Lowenstein installed an eight-inch drain pipe (the "8-inch Drain Line") at the AD&F facility to serve as a French drain directing groundwater away from the building that housed the textile manufacturing operations. [Id. at ¶ 69]. At an unknown time, and by persons unknown, the 8-inch Drain Line was capped approximately 1,100 feet east of the structures at the AD&F Facility and directed towards a public sewer line and the remaining portions of the 8-inch Drain Line may be collecting groundwater contaminated by other releases of hazardous substances at the AD&F Facility and causing additional releases of such hazardous substances to

soil, groundwater, surface water and sediment at, and in the vicinity of, the AD&F Facility. [Id. at ¶ 70].

Lowenstein constructed floor drains and trench drains, with related piping, in the manufacturing building at the AD&F Property (hereinafter, the "AD&F Floor and Trench Drain System") for the purpose of draining waste materials contaminated with hazardous substances from work areas in the manufacturing building to the AD&F Facility's wastewater treatment system. [Id. at ¶¶ 78-79]. Lowenstein also constructed a Dye Mixing Room on the second story of the manufacturing building at the AD&F Facility, which includes on its southern side a secondary containment berm and a drain, with related piping (the "Dye Mixing Room Drain"). [Id. at ¶¶ 81-82]. The Dye Mixing Room Drain connects to the AD&F Facility's underground piping systems, which leads to the AD&F Facility's wastewater treatment system. [Id. at ¶ 83].

Lastly, Lowenstein constructed a secondary containment area within the AD&F Facility's Dye Receiving Area for the purpose of storing tote containers that contained hazardous substances used in the mixing of fabric dyes. [Id. at ¶¶ 85-86]. A floor drain, with related piping, is located in the center of said secondary containment area (hereinafter, the "Tote Farm Floor Drain"). [Id. at ¶ 87]. The Tote Farm Floor Drain connects to the AD&F

Facility's underground piping systems, which leads to the AD&F Facility's wastewater treatment system [Id. at ¶ 88].

On March 3, 1976, Lowenstein sold the AD&F Facility to Winston Mills, Inc ("Winston Mills"). [Id. at ¶ 43].

### (4) WMI II, McGregor II, and Samsonite

WMI II is the successor to Winston Mills. [Id. at ¶ 45]. Winston Mills, which operated under the tradename "Asheville Dyeing & Finishing," acquired the AD&F Facility from Lowenstein on March 3, 1976 and sold it to an entity known as Anvil Knitwear, Inc. ("Anvil") on January 28, 1995 (the "Winston Mills Ownership Period"). [Id. at ¶ 46]. During the Winston Mills Ownership Period, Winston Mills exercised actual control over matters related to pollution, releases of hazardous substances and environmental compliance at the AD&F Facility. [Id. at ¶ 47]. During Winston Mills Ownership Period, Winston Mills was a wholly owned subsidiary of McGregor Corporation. [Id. at ¶ 48]. McGregor Corporation exercised actual control over matters related to pollution, releases of hazardous substances and environmental compliance at the AD&F Facility during the Winston Mills Ownership Period. [Id. at ¶ 50]. McGregor II is the successor entity to McGregor Corporation. [Id. at ¶ 49]. At all times relevant, Samsonite is, and has been, the sole member and manager of McGregor II and McGregor

11

Corporation. [Id. at ¶ 51]. Samsonite exercised actual control over matters related to pollution, releases of hazardous substances and environmental compliance at the AD&F Facility during the Winston Mills Ownership Period. [Id. at ¶ 52].

Between approximately March 3, 1976 and March 1985, Winston Mills owned and operated two underground storage tanks ("UST") at the AD&F Facility containing the hazardous substance perchloroethylene ("PCE") and used one UST to store unused PCE and used the other UST to store waste PCE (the "Waste PCE Tank"). [Id. at ¶¶ 53-54].

On August 12, 1976, Winston Mills caused a spill and subsequent release of 200 gallons of PCE and 50 gallons of a solution containing 10% PCE to the environment (the "1976 PCE Release"). [Id. at ¶ 67]. The 1976 PCE Release entered the 8-inch Drain Line at the AD&F Facility that ultimately discharged to Bee Tree Creek. [Id. at ¶ 68]. Further, during Winston Mills Ownership Period, wastes generated by Winston Mills and conveyed *via* the AD&F Floor and Trench Drain System caused releases and/or threatened releases of hazardous substances to the environment. [Id. at ¶ 79 (detailing substances)]. Winston Mills further conveyed hazardous substances through the Dye Mixing Room Drain, and piping connected thereto, to the AD&F Facility's wastewater treatment system and caused

releases and/or threatened releases of hazardous substances to the environment. [Id. at ¶ 84 (detailing substances)]. Winston Mills also used the Tote Farm Floor Drain, and piping connected thereto, to convey hazardous substances to the AD&F Facility's wastewater treatment system and caused releases and/or threatened releases of hazardous substances to the environment. [Id. at ¶ 88 (detailing substances)].

Following Winston Mills' removal of the Waste PCE Tank in March 1985, NCDEQ alleged that a release of waste PCE into the environment had occurred at some point in the past. [Id. at ¶¶ 55-56]. Aerial photos of the AD&F Facility taken in 1988 showed, for the first time, two newly-disturbed areas of soil at the AD&F Property. [Id. at ¶ 71]. Winston Mills was the sole owner and operator of the AD&F Facility at the time these areas of disturbed soil were first observed. [Id. at ¶ 72]. One such area (hereinafter "Disturbed Soil Area A") is located approximately 100 feet north of the northwest corner parking area at the AD&F Facility and is approximately 45 feet in diameter and the second such area (hereinafter "Disturbed Soil Area B") is located approximately 60 feet to the east-northeast of Disturbed Soil Area A and is approximately 70 feet wide by 80 feet long. [Id. at ¶¶ 74-75]. Soil samples taken in the vicinity of Disturbed Soil Area A indicate releases of hazardous substances, including PCE, xylene and toluene, and have caused

contamination of soil and groundwater at other locations on, or nearby, the AD&F Facility, including but not limited to Disturbed Soil Area B. [Id. at ¶¶ 75-76].

On August 29, 1990, Winston Mills and NCDEQ entered into an Administrative Order on Consent regarding the Waste PCE Tank (the "1990 AOC"), which required Winston Mills to submit a plan to close the former location of the Waste PCE Tank as a hazardous waste landfill as required by the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. ("RCRA"). [Id. at ¶¶ 57-58]. The 1990 AOC also required Winston Mills to submit a post-closure plan for the long-term care of the former location of the Waste PCE Tank. [Id. at ¶ 59]. Winston Mills submitted a combined Closure/Post-Closure Plan for the former location of the Waste PCE Tank to NCDEQ on March 31, 1992, which NCDEQ approved on July 8, 1992. [Id. at ¶¶ 60-61]. On March 10, 1993, NCDEQ accepted Winston Mills certification of closure of the Waste PCE Tank's former location as a hazardous waste landfill and instructed Winston Mills to implement the approved post-closure plan (the "Post-Closure Plan"). [Id. at ¶¶ 62-64]. The approved Post-Closure Plan requires maintenance of the cap placed above the former location of the Waste PCE Tank, the installation of numerous monitoring wells, periodic sampling of those wells for an extensive number of hazardous substances,

and posting of financial assurance for the estimated costs associated with implementing the Post-Closure Plan. [Id. at ¶ 65].

### (5) Gildan

Gildan is the successor to Anvil. [Id. at ¶ 90]. Anvil was the sole owner and operator of the AD&F Facility from January 1995 until December 2007 (the "Anvil Ownership Period"). [Id. at ¶ 91]. During the Anvil Ownership Period, Anvil exercised actual control over matters related to pollution, releases of hazardous substances and environmental compliance at the AD&F Facility. [Id. at ¶ 93].

On October 2, 2006, Anvil filed a voluntary petition for bankruptcy in the United States Bankruptcy Court for the Southern District of New York. [Doc. 80-1].[3] On January 10, 2007, Anvil's reorganization plan was confirmed, and the bankruptcy case was closed on June 14, 2007. [See Docs. 80-2, 80-3, 80-4, and 80-5].

---

[3] Pursuant to Federal Rule of Evidence 201(b)(2), "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The Fourth Circuit has noted that "the most frequent use of judicial notice of ascertainable facts is in noticing the content of court records." Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir.1989). Although the relevant bankruptcy documents are not mentioned on the face of Plaintiff's Amended Complaint, the accuracy of these documents cannot be reasonably question. Therefore, the Court takes judicial notice of the submitted bankruptcy records without converting the motion to dismiss to one for summary judgment. See Anderson v. Fed. Deposit Ins. Corp., 918 F.2d 1139, 1141 n. 1 (4th Cir.1990); see also Parker v. Homestead Studio Suites Hotel, 2005 WL 3968291 at *1 (E.D.N.C. May 13, 2005), aff'd, 141 F. App'x 196 (4th Cir.2005).

During the Anvil Ownership Period, Anvil submitted numerous documents to NCDEQ admitting its status as the owner, or the owner/operator, of the AD&F Facility, including applications for permits required by environmental laws. [Id. at ¶ 94]. Anvil was the owner and operator of the AD&F Facility during times that the 8-inch Drain Line may have been collecting groundwater contaminated by other releases of hazardous substances at the AD&F Facility and causing additional releases and/or threatened releases of such hazardous substances to soil, groundwater, surface water and sediment at, and in the vicinity of, the AD&F Facility. [Id. at ¶ 95 (detailing substances)]. Anvil was the owner and operator of the AD&F Facility at the time releases and/or threatened releases of hazardous substances occurred in the vicinity of Disturbed Soil Area A that may have caused contamination of soil and groundwater at other locations on, or nearby, the AD&F Facility, including but not limited to Disturbed Soil Area B. [Id. at ¶ 96].

Anvil actually used the AD&F Floor and Trench Drain System to drain waste materials contaminated with hazardous substances from work areas in the manufacturing building to the AD&F Facility's wastewater treatment system. [Id. at ¶ 97]. Wastes generated by Anvil and conveyed *via* the AD&F Floor and Trench Drain System caused releases and/or threatened releases

16

of hazardous substances to the environment. [Id. at ¶ 98 (detailing substances)]. Anvil actually used the Dye Mixing Room during the Anvil Ownership Period to store hazardous substances and used the Dye Mixing Room Drain, and piping connected thereto, to convey hazardous substances to the AD&F Facility's wastewater treatment system and caused releases and/or threatened releases of hazardous substances to the environment. [Id. at ¶¶ 99-100]. During the Anvil Ownership Period, Anvil actually used the secondary containment area in the AD&F Facility's Dye Receiving Area and used the Tote Farm Floor Drain to convey hazardous substances to the AD&F Facility's wastewater treatment system and caused releases and/or threatened releases of hazardous substances to the environment. [Id. at ¶¶ 99-100 (detailing substances)].

### (6) Dyna-Diggr, Brisco, Smokey Mountain Pallet

On December 19, 2007, Dyna-Diggr LLC ("Dyna-Diggr") acquired the AD&F Facility from Anvil and has owned the AD&F Facility since that time (the "Dyna-Diggr Ownership Period"). [Id. at ¶ 108]. During the Dyna-Diggr Ownership Period, Dyna-Diggr, Brisco and Smokey Mountain Pallet, exercised actual control over and caused the releases or threated releases

17

of hazardous substances to the environment at the AD&F Facility. [See Id. at ¶¶ 109-151].[4]

## B.    Plaintiff and the AD&F Facility

Plaintiff is the current operator of the AD&F Facility. [See Docs. 69 at ¶ 154-160; 69-5; 69-7].

As of the filing of its Amended Complaint, Plaintiff has incurred a total of at least $798,649.00 in response costs at the AD&F Facility associated with:

> (i) funding groundwater monitoring required of Winston Mills under the DEQ-approved Post-Closure Plan for the Waste PCE Tank, (ii) funding maintenance of the two air-sparge / soil-vapor extraction systems at the AD&F Facility installed, upon information and belief, at Anvil's behest and under the supervision of NCDEQ [North Carolina Department of Environmental Quality], (iii) posting financial assurance on behalf of Winston Mills in accordance with Winston Mills' requirements under the DEQ approved Post-Closure Plan and (iv) funding the assessment of the Northrop Dump under the supervision of NCDEQ.

[Doc. 69 at ¶ 152]. Plaintiff never generated, transported, treated, stored, disposed, or arranged for disposal of any hazardous substances at any

---

[4] The Court does not address the full allegations as set forth in the Amended Complaint against the non-moving Defendants Dyna-Diggr, Brisco, and Smokey Mountain Pallet, as the allegations are not pertinent to the Court's analysis of the present motions to dismiss.

portion of the AD&F Facility, nor has it caused or contributed to the release of any hazardous substances at the AD&F Facility. [Id. at ¶ 153].

On November 30, 2018, notwithstanding the fact that Plaintiff did not cause or contribute to the environmental contamination at any part of the AD&F Facility, the Superior Court of Buncombe County, North Carolina issued an order requiring Plaintiff to apply for – and abide by the terms of – a RCRA Part B Permit for the AD&F Facility (the "Superior Court Order"). [Id. at ¶ 154; Doc. 69-5]. On January 25, 2019, the North Carolina Court of Appeals denied Plaintiff's motion seeking a stay of the Superior Court Order. [Id. at ¶ 155; Doc. 69-6]. On February 28, 2019, under protest and with full reservation of all rights and legal defenses, Plaintiff made a good-faith submission of such portions of the application required by the Superior Court Order as it was able to do at that time. [Id. at ¶ 156]. On January 7, 2020, the North Carolina Court of Appeals affirmed the Superior Court Order. [Id. at ¶ 157; Doc. 69-7]. On or about June 25, 2020, NCDEQ published a draft RCRA Part B Permit for the AD&F Facility (the "Draft Permit"). [Id. at ¶ 158; Doc. 69-8]. Part IV of the Draft Permit requires Plaintiff to implement groundwater protection measures and treatment associated with releases of hazardous substances from the Waste PCE Tank. [Id. at ¶ 159].

## IV. DISCUSSION

### A. CERCLA

CERCLA provides two main causes of action through which private parties that have incurred cleanup costs can seek reimbursement from other private parties: cost-recovery pursuant to § 107(a) and contribution pursuant to § 113(f). 42 U.S.C. §§ 9607(a) and 9613(f). A cost-recovery action under § 107(a), allows a party to "recover all costs of [a] removal or remedial action from any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." Territory of Guam v. United States, 141 S. Ct. 1608, 1611–12, 209 L. Ed. 2d 691 (2021) (internal quotations, citations, and parentheticals omitted). A contribution action under § 113(f), allows a party "who has resolved its liability to the United States ... for some or all of a response action or for some or all of the costs of such action in [a] settlement may seek contribution from any person who is not [already] party to a [qualifying] settlement." Id.

Here, in its First Claim for Relief, Plaintiff seeks the recovery of costs from the Defendants under § 107(a). In its Second Claim for Relief, Plaintiff seeks contribution from the Defendants under § 113(f). The Defendants now move to dismiss Plaintiff's CERCLA claims arguing, *inter alia*, that: (1)

Plaintiff has failed to allege that it is a responsible party such that it can recover under § 113(f); and (2) Plaintiff's allegations are insufficient to show that Plaintiff's response costs were necessary and consistent with the National Contingency Plan such that it can recover under § 107(a). In addition, Defendant Gildan separately argues that the claims against it should be dismissed because such claims were discharged in the bankruptcy of its predecessor, Anvil. The Court will address each of these arguments in turn.

### 1. § 113(f)

Section 113(f) of CERCLA provides:

> Any person may seek contribution from any other person who is liable or potentially liable under section 9607(a) of this title, during or following any civil action under section 9606 of this title or under section 9607(a) of this title. Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 9606 of this title or section 9607 of this title.

42 U.S.C.A. § 9613(f)(1). Further, Section 113(f)(3)(B) provides, in relevant part, that:

> A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in [Section 113(f)(2)].

42 U.S.C.A. § 9613(f)(3)(B).

Plaintiff asserts that it has expended considerable sums in order to comply with the state court's order in the action brought by NCDEQ regarding the clean up of the property. The Defendants argue that Plaintiff's losses do not come within the scope of §113(f), and thus Plaintiff's contribution claim must be dismissed.

In <u>Territory of Guam v. United States</u>, the Supreme Court recently addressed the issue of who may bring a contribution action under § 113(f)(3)(B), stating that "[t]he most natural reading of § 113(f)(3)(B) is that a party may seek contribution under CERCLA only after settling a CERCLA-specific liability." 141 S. Ct. 1608, 1615, 209 L. Ed. 2d 691 (2021). In determining what constitutes a settlement of a "CERCLA-specific liability," the Supreme Court held that "[r]ather than requiring parties and courts to estimate whether a prior settlement was close enough to CERCLA, the far simpler approach is to ask whether a settlement expressly discharged a CERCLA liability." <u>Id.</u> However, a responsible or potentially responsible party ("PRP") "cannot recover [r]esponse [c]osts under § 107(a) of CERCLA from

22

another responsible party. Rather, for one responsible party to recover [r]esponse [c]osts from another responsible party, the first responsible party must seek contribution from the other responsible party pursuant to § 113(f) of CERCLA." Minyard Enterprises, Inc. v. Se. Chem. & Solvent Co., 184 F.3d 373, 385 (4th Cir. 1999) (citing Pneumo Abex Corp. v. High Point, Thomasville & Denton R.R. Co., 142 F.3d at 776 (4th Cir.1998)) (internal citations omitted).

In other words, if a party has incurred environmental costs regarding a property, that party has two potential claims against a "responsible party." Which claim such plaintiff may pursue depends on whether that plaintiff itself is a "responsible party." If the plaintiff has incurred or may incurred CERCLA liability as a "responsible party" itself, then its claim is for contribution under § 113(f). If the plaintiff is not, then any claim it may have must fall under § 107.

Here, Plaintiff has made no allegation that it has entered into a settlement that expressly discharges a CERCLA liability or has otherwise resolved a CERCLA-specific liability. Plaintiff's allegations regarding its compliance with the state court judgment regarding its state law liability do not fall within the scope of Guam. Further, Plaintiff has not alleged that it is a "responsible party" by way of having caused, contributed, or otherwise

having been responsible for the release of hazardous substances on the property. Rather, Plaintiff alleges:

> [Plaintiff] never generated, transported, treated, stored, disposed, or arranged for disposal of any hazardous substances at any portion of the AD&F Facility, nor has it caused or contributed to the release of any hazardous substances at the AD&F Facility, including but not limited to the Northrop Dump.

[Doc. 69 at ¶ 153]. As such, Plaintiff fails to state a claim for relief under §113(f)(3)(B).

Accordingly, the Plaintiff's Second Claim for Relief seeking contribution from the Defendants pursuant to CERCLA § 113(f) will be dismissed.

### 2.    § 107

Under §107 of CERCLA, a "private-party plaintiff establishes a *prima facie* case for cost recovery under CERCLA by establishing that (1) the defendant is a potentially responsible person ("PRP"); (2) the site constitutes a "facility"; (3) a "release" or a threatened release of hazardous substances exists at the "facility"; (4) the plaintiff has incurred costs responding to the release or threatened release of hazardous substances ("response costs"); and (5) the response costs conform to the National Contingency Plan [NCP]." PCS Nitrogen Inc. v. Ashley II of Charleston LLC, 714 F.3d 161, 167–68 (4th Cir. 2013) (citations omitted). Further, a private party action under §107 must

establish that the cost it incurred is a necessary cost of response. See 42 U.S.C. § 9607(a)(4)(B) (making PRPs "liable for ... necessary costs of response by any [private] person").

CERCLA provides that "response" or "respond" "means remove, removal, remedy, and remedial action" and that "all such terms (including the terms 'removal' and 'remedial action') include enforcement activities related thereto." 42 U.S.C. § 9601(25). CERCLA directs the establishment of the "national contingency plan," or "NCP," as a "national hazardous substance response plan which shall establish procedures and standards for responding to releases of hazardous substances, pollutants, and contaminants," to be implemented through administrative regulations. 42 U.S.C. § 9605(a). The EPA has "promulgated the national contingency plan as a regulation pursuant to [§ 9605], codified at 40 C.F.R. pt. 300 (1993)." Key Tronic Corp. v. United States, 511 U.S. 809, 813 (1994). The EPA added to the "Code of Federal Regulations to clarify what 'consistent with the NCP' means for the purpose of cost collection under 42 U.S.C. § 9607." Richland-Lexington Airport Dist. v. Atlas Properties, Inc., 901 F.2d 1206, 1208 (4th Cir. 1990).

Under these regulations, "[a] private party response action will be considered 'consistent with the NCP' if the action, when evaluated as a

whole, is in substantial compliance with the applicable requirements in paragraphs (5) and (6) of this section, and results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). The regulations require reference to standards for "removal site evaluation[s]," "removal actions," "selection of remedy," and "operation and maintenance," as well as "substantially equivalent state and local requirements" regarding "public comment concerning the selection of the response action." 42 C.F.R. § 300.700(c)(5), (6).

A response action is "consistent with the NCP" if the action is in "substantial compliance" with 40 C.F.R. § 300.700(c)(5)-(6), and results in a "CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). "An 'immaterial or insubstantial' deviation, however, will not result in a cleanup that is 'not consistent' with the NCP." Ashley II of Charleston, LLC v. PCS Nitrogen, Inc., 791 F. Supp. 2d 431, 480 (D.S.C. 2011), aff'd, 714 F.3d 161 (4th Cir. 2013); 40 C.F.R. §300.700(c)(4)). Further, showing consistency with the NCP is often met if "the remediation work is carried out under the approval and monitoring of the appropriate state environmental agency." City Of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 91 (1st Cir. 2008) (citing NutraSweet Co. v. X–L Eng'g Co., 227 F.3d 776, 791 (7th Cir.2000); Esso Standard Oil

Co. (P.R.) v. Rodríguez–Pérez, No. 01–2012, 2004 WL 2238894, at *13
(D.P.R.2004)).

Here, the Defendants argue that Plaintiff's Amended Complaint fails to provide sufficient allegations to plausibly fulfill the fifth element that Plaintiff's response actions were "necessary" and "consistent" with the NCP.

The Amended Complaint sets forth the actions that were taken by Plaintiff, including:

> (i) funding groundwater monitoring required of Winston Mills under the DEQ-approved Post-Closure Plan for the Waste PCE Tank, (ii) funding maintenance of the two air-sparge / soil-vapor extraction systems at the AD&F Facility installed, upon information and belief, at Anvil's behest and under the supervision of NCDEQ [North Carolina Department of Environmental Quality], (iii) posting financial assurance on behalf of Winston Mills in accordance with Winston Mills' requirements under the DEQ approved Post-Closure Plan and (iv) funding the assessment of the Northrop Dump under the supervision of NCDEQ.

[Doc. 69 at ¶ 152]. Further, Plaintiff alleges that the NCDEQ Draft Permit requires Plaintiff to implement groundwater protection measures and treatment associated with releases of hazardous substances from the Waste PCE Tank and to investigate, as warranted, and remediate other releases of hazardous substances at the AD&F Facility, including those associated with the 8-inch Drain Line, Disturbed Soil Areas A and B, the AD&F Floor and

Trench Drain System, the Dye Mixing Room Drain and the Tote Farm Floor Drain. [Id. at ¶159, 160]. As such, the Amended Complaint alleges sufficient facts to state a claim for relief that is plausible on its face that the response costs incurred were necessary to address an actual and real threat to human health or the environment and were consistent with the NCP. Therefore, the Defendants' motion to dismiss the Plaintiff's §107(a) cost recovery claim will be denied.

Having concluded that Plaintiff has plausibly asserted a claim under §107(a), the Plaintiff's Fourth, Fifth, and Sixth Claims for declaratory relief under CERCLA survive as well. Further, the Court declines to dismiss Plaintiff's Third Claim for Relief seeking equitable indemnification and/or contribution from the Defendants under state law and Plaintiff's Seventh Claim for Relief seeking an order requiring Defendants to abate a public nuisance under state law, as they are based upon the same factual allegations as are the surviving CERCLA claims.

## B. Anvil Bankruptcy and Gildan's PRP Status

Under CERCLA, "successor corporations may be liable for the actions of their predecessors." PCS Nitrogen Inc. v. Ashley II of Charleston LLC, 714 F.3d 161, 173 (4th Cir. 2013) (citing United States v. Carolina Transformer Co., 978 F.2d 832, 837 (4th Cir.1992)). Under the Bankruptcy Code, a "claim"

is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(a).

The Bankruptcy Code broadly defines "claim" to facilitate Congress' intent that "all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy." Grady v. A.H. Robins Co., Inc., 839 F.2d 198, 200 (4th Cir.1988). However, "[a]lthough the term "claim" is broadly defined under the Bankruptcy Code, it does not include actions arising post-petition." In re Hutson, 173 F.3d 424 (4th Cir. 1999) (citing Grady v. A.H. Robins Co., 839 F.2d 198, 200 (4th Cir.1988)). As such, a claim exists "when the conduct giving rise to the alleged liability occurred." In re Piper, 58 F.3d 1573, 1577 (11th Cir.1995) (citing Grady, 839 F.2d at 199). "Roughly stated, prepetition conduct can give rise to a § 101(5)(a) claim, and post-petition conduct cannot." Concord W. of the Ashley Homeowners' Ass'n v. J.A. Jones, Inc., No. 3:09-CV-00182-GCM, 2010 WL 148432, at *1 (W.D.N.C. Jan. 12, 2010).

CERCLA incorporates by reference the definition of "disposal" found in the Resource Conservation and Recovery Act (RCRA). 42 U.S.C. § 9601(29). That definition states:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any

> solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. § 6903(3). "Some of the words in this definition appear to be primarily of an active voice. This is true of "deposit," "injection," "dumping," and "placing."" Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 844–45 (4th Cir. 1992)(internal citation omitted). Other words, however, "readily admit to a passive component: hazardous waste may leak or spill without any active human participation." Id.  Further, CERCLA defines the term "release" as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment." 42 U.S.C.A. § 9601.

Here, the Defendant Gildan separately argues that the claims against it were previously discharged in bankruptcy, as Gildan's liability is based on its status as the corporate successor-in-interest of Anvil. [Docs. 79, 80]. Specifically, Defendant Gildan argues that the Plaintiff's claims for recovery of environmental response costs are based on releases of hazardous substances to the environment occurring in 1998, eleven years pre-petition, and therefore the claims accrued prior to and were discharged in Anvil's 2007 bankruptcy proceeding. [Docs. 80, 92]. In contrast, Plaintiff argues that the

30

claims against Defendant Gildan are based on Anvil's post-confirmation ownership and operation of the AD&F Facility, and therefore were not discharged in Anvil's bankruptcy. [Doc. 85].

Only a small part of Anvil's Ownership Period was post-petition. The only specific allegations Plaintiff makes regarding Anvil's actions, [Doc. 69 at ¶¶ 104-07], pertain to the pre-petition period. It is far from clear that Plaintiff is asserting any claim based on Anvil's actions post-petition. In fact, Plaintiff only alleges that Anvil's violative actions occurred at some time during the Ownership Period (1995-2007). Plaintiff does not even claim that such actions extended into those last few months of Anvil's ownership. Nonetheless, giving Plaintiff the benefit of all reasonable inferences, the Court can draw the inference that Anvil remained in business continuously through the Ownership Period, and that the violations were consistent throughout such activities—including during those last few months. Such post-petition, post-confirmation, and post-closing conduct could not have been discharged in Anvil's bankruptcy and therefore any liability for such conduct would remain with Anvil or, in this case, its successor-in-interest, Defendant Gildan.

Therefore, drawing all reasonable inferences in favor of the Plaintiff, and giving the Plaintiff the benefit of a substantial doubt, the Court concludes

that the claim against Defendant Gildan is sufficient to avoid dismissal at this early stage.

**IT IS, THEREFORE, ORDERED** that the Defendants Northrop Grumman Corporation, CNA Holdings, LLC, and Chemtronics, Inc.'s Motion to Dismiss Plaintiff's Amended Complaint [Doc. 77], the Defendant Gildan USA, Inc.'s Motion to Dismiss the Amended Complaint [Doc. 79], and the Defendants Samsonite LLC and McGregor II LLC's Motion to Dismiss Plaintiff's Amended Complaint [Doc. 81] are **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Motions are **GRANTED** with respect to the Plaintiff's Second Claim for Relief in the Amended Complaint, and that claim is **DISMISSED WITH PREJUDICE**. The Defendant's Motions are **DENIED** with respect to the Plaintiff's First, Third, Fourth, Fifth, Sixth, and Seventh Claims for Relief in the Amended Complaint.

**IT IS SO ORDERED.**

Signed: September 30, 2021

Martin Reidinger
Chief United States District Judge